Okay, our last case this morning is number 19-12999, Equity Insurance Company. Mr. Dolder. Yes. May it please the court? Go right ahead. Yes. Yeah. My name is Rich Dolder. Joining me somewhat remotely are Jay Saad and Michael Werner. We represent Amy Kemper against Equity Insurance Company in this action. Your honors, we think this is an obvious case of insurance negligence, insurance bad faith, and we asked the court to reverse. And to explain why I'm going to start with two propositions of law, and then three facts and bullet point fashion that I'd like to get across to the court. And then of course, hopefully after that, we'll I want to hear, you know, more from your concerns, but more than any speech I can prepare. But the, the two issues of law are that, you know, Georgia law has been clear for many decades, that an insurance company has a duty to accept a reasonable opportunity to settle within the policy limits. Georgia law is also clear the second proposition, that an insurance company has a duty to reasonably respond to a settlement offer within the policy limits. Now, this case involves a reasonable opportunity to settle within policy limits that the insurance company rejected with an unreasonable counteroffer. And the counteroffer was unreasonable for at least three reasons. First, the counteroffer included an escrow account demand. It was a demand that statewide equities adjuster statewide acted as equities agent statewide demanded that Miss Kemper put 100% of the settlement funds into an escrow account for an indefinite period of time to second unreasonable part of the counteroffer was statewide tried to sneak in a property damage release. Miss Kemper offered to settle her bodily injury claim. And at that time, statewide was negotiating the property damage claim and had not paid it and asked her to release that. Uh, third, the counteroffer required as a condition of settlement that Miss Kemper swear under oath that all of her hospital bills had been paid. As court knows, she was severely injured. This is a week after she had gotten out of the hospital. There is no way anyone can swear under oath that all their hospital bills had been paid. They were being paid. But as we know, it takes insurance companies, health insurance companies time to pay claims. Did she not? Did she not send them a letter, um, demanding that she be paid the full amount of the policy? No later than June 8th, 2012 21 days from the date of this letter, which was 5 18. Did she not ask them to have the full policy limits paid to her? She did 21 days. She did, Your Honor. Uh, that was the reasonable opportunity to settle. In this case is Amy Kemper's handwritten demand that she wrote with the help of attorney Michael Werner. And it was a very simple demand, uh, as required by, uh, first acceptance fee Hughes. It was valid because it was capable of to accept her demand was to, uh, send a conforming release and send the check within the 20 day time period that your honor mentioned. Um, and statewide did some of those things. It sent the check, but it sent a release with those terms I just mentioned and others that were acceptable and contrary to what she the Wellstar case. But I think that's part of the case at that issue here. And tell me why the letter that was sent by Mr Chop to Miss Kemper on June 5th, uh, did not comply or did not follow the carve out, um, or the safe harbor that will start created in that in that case. Yes, Your Honor. For two the Wellstar safe harbor, which is an affirmative defense, requires equity to prove, uh, that it is entitled to the affirmative defense by showing that there were outstanding hospitalings. In this case, there were no hospitalings. There never were before. Mr Chopping. If there are no, if there no hospitalings and what is the what is the harm of, uh, for just taking the check and then we don't have any leans. I mean, they said to put it in escrow, but I think the actual language used was, um, we're entrusting that you place this money in an escrow in regards to any and all means pending. So if there's no means pending, then she could just take the money. Well, no one knew whether there were lean spending your honor because pending also means future liens. Then why again? Is it not conforming with the safe harbor language that was created in Wellstar by the court? Because the language Judge Dillard used when he crafted the safe harbor expressly says outstanding hospitalings and there were no outstanding hospitalings. Yet the language that your honor just quoted in Mr Chop's letter required Miss Kemper to put the money into escrow with regards, first of all, to any and all liens, not just hospital liens and any that might arise in the future. And we know it's future because Miss Thetford, who drafted, uh, that language that they were using his new office policy here the language specifically says, I apologize for interrupting you. It says, uh, the insurance company could request that plaintiff's counsel. And in this case, the letter sent by your your client specifically said, Don't contact me again. So and there was no indication that she was represented by counsel at the time, since she specifically said, If you don't meet my demand, I'll be forced to hire an attorney. So the insurance company clearly was not notice that they had that she had an attorney who helped her draft that letter at the time that they sent in June letter to her back with the with the full amount of the proceeds of the insurance policies. So it says here, uh, the insurance company could request that plaintiff's counsel or a third party hold a portion on proceeds in escrow to allow the plaintiff an opportunity to investigate the validity of the liens and to negotiate. And once the lien resolving documents have been executed, the held back settlement funds and could be dispersed to the plaintiff. So again, I I'm having difficulty understanding, uh, this safe harbor language seems to indicate then that the burden then would be on the plaintiff to investigate whether or not there's any liens and then to take the mean amount out of those escrow amounts and pay off the liens. And then they could be dispersed. Whatever's left. Well, well, Your Honor, I do not believe it puts the burden on the plant. The burden is on equity to prove, uh, that they're entitled to the affirmative defense. But that scenario that your honor, uh, described and that Judge Dillard wrote about could never occur in this case because there were no liens and statewide new, you know, Mr Chopp, who wrote the letter, uh, spoke to Bill Allred, Georgia insurance defense attorney who immediately upon looking at the facts of the claim advice, didn't you just say that she, uh, she had just gone out. She was still in the hospital when she wrote that letter, right? And, uh, is it not possible that there would be means at some point? Of course it was possible that there could be liens at some point. Mr. Allred advised it was highly unlikely, and in the end there were not. So why again? Is it? Is it outside the norm for them to say, please ask for the money until and then to pay off the liens? Because that's what the well star safe harbor provision, uh, the language allows in the well star case. Yeah, it doesn't say that there has to be means. It's just saying you need to verify whether there's means. And if there's lean, then you need to pay it off and then disperse whatever amounts are left afterwards, if any, I guess. Well, I think the well started decision respectfully does say that there has to be outstanding hospitalings. But the answer to your question is that once the money is paid to Miss Kemper when it is delivered to her, there is then a binding settlement agreement and, um, statewide and equity and the insured Brown would have no liability for liens filed after that. Somebody said it's unsure, uh, reacted to a plaintiff's unreasonable refusal to assure satisfaction of hospital leaves at the condition of receiving policy limits. The insurer would create a safe harbor from liability under Bolt and his progeny. I mean, it doesn't say there to assure satisfaction of outstanding hospitalings. It just says hospital means yes, adding additional language to that opinion that I assume the court did not intend. Well, Mr. Chop's letter is way outside the self harbor, safe harbor of Wellstar, because it would require her to keep the money in escrow for future liens that might occur at some point. They might occur next month. Your honor, because of her injuries, Miss Kemper is still treating today. Um, there could be a lien arising out of her medical treatment at any time. Your point, one of your points, Mr Dolder in the brief, I think, is that once the settlement was consummated, had it been consummated between equity and Miss Kemper, then equities liability for any subsequent liens would have been extinguished, right? They would have been. They wouldn't have had any liability for any lien perfected after consummation of the settlement agreement, and that's 44-14 dash 473 B. Rather than settlement, it used the cumbersome phrase covenant not to bring an action. But yes, your honor. And the other the other point you make in the brief is that the letter from Mr Chop to Miss Kemper, along with the check, was not limited to medical liens. It said any and all liens pending, which theoretically could have dealt with non medical liens arising from the you think was beyond what the Wellstar case allowed as a safe harbor. Well beyond your well beyond your honor. And indeed, statewide, we can tell from the claim file was highly interested for some reason in child support liens and did searches on those as well. Before you sit down, can I get you to address the issue of um, the failure to communicate here. Part of the language in the demand letter was do not contact me again. And if the question is whether there were outstanding liens, the insurance company is saying we really had no way to verify that we didn't. We had no. We were told not to contact, um, Miss Kemper. So what do you say about that? Two things, your honor. First, uh, when Miss Kemper wrote that, and as she testified in her deposition, the terms of her demand were very simple, and that was her way of saying this is non negotiable. Don't bother. Call me. And you know that that's what insurance companies do all the time. That's what lawyers do all the time. Many parties do that all the time. They offer a settlement, and it's non negotiable. That was her way of saying, Don't bother to call me. It's non negotiable. The second part to answer your question, your honor, is that calling Miss Kemper was an immaterial fact. It would have not changed the outcome. This was a new office policy. Mr Chobb and putting that escrow count demand in the counteroffer was just enacting a new office policy. It was going to happen no matter what. It was further immaterial because there was nothing a lay person like Miss Kemper could say. Either the lien is perfected in the public records or it is not. Mr Allred, the attorney, asked Mr Chobb, Do you want? He did a lien search. There were no liens. He said, Do you want me to send someone to the courthouse to double check? It would have taken his paralegal one hour to do it. And they said no. Statewide didn't want to that there was in the record. I thought there was a indication that they actually had looked to see if there were some means. I'm sorry, Your honor, I did not understand. I'm sorry. In the record when I looked, I thought that they had looked to see if there had been some means. Yes, Mr Allred hired a third party vendor to check and see if there were liens and that third party vendor reported that there were no liens. And then it raised the question there was perhaps and three layers of hearsay. There might have been a day or two delay in the filing. And that's why Mr Allred said, if you want me to send someone to the courthouse, we can do that cheap and easy and we can find out for sure. Statewide said no, we've done our due diligence. All right, Mr Dolder, thank you very much. You've saved your time for rebuttal. Thank you, Your honor. Mr Schmidt, may it please the court. Um, we look at this case down to two issues, and those are, uh, first one I'll address is that Miss Kemper's demand did not create a whole duty to settle. The second issue relative to this is we contend that equity acted reasonable in responding. Mrs Kemper's demand in his title to the safe harbor I'll address those in order here. The first item is far as the whole demand. Um, here the demand was silent on the issue of liens didn't address it in any way, shape or form. And then you add to that the no call demand. That's tantamount to refusing to give any assurances about liens. Um, and consistent with that, with an insurance company, they're obliged to protect their insurance. And under these circumstances, they could not do that given that, um, they were flying blind. Um, Judge, you're not the same. But at the same time, you say you're trying to protect the insured. You're exposing him to a multimillion dollar judgment by not settling for the policy limits. That's exactly what you did. No, actually, we did not. Um, because if we if there are no leads and we get a release or a lien waiver, then the insurance company as well as Mr Brown is protected. However, there is a gap period in which we know from the record that there was a two day gap in which if the, um, uh, if we sent the check, we don't know what would have happened when she received the check during that two day period of time when she would have signed the release, among other things, um, regarding all of those issues. Also, in this case, Miss Kemper says that the solution for equity was to just send the check. And had they sent the check, they would not have been protecting their insurance because we didn't know about lanes. And so it was absolutely required to know about liens. And that is consistent with what well start provides, but also crabs, which is a Also, I would say, and I can give you that side if you'd like. Um, that on that same point, if I could, Mr Schmidt, why did the letter from Mr Chop to Miss Kemper refer to any and all liens as opposed to the medical liens for which you or the insured would have been on the hook for because we had received information, uh, regarding potential, uh, assignments of claims that were out there to medical hospital and then to medical providers. So there were other things. Had we not done that, we would not have protected are insured again. You would still those. Those are all medical. Those are all medical hospital. I understand. This says this says any and all liens. That is over and above the well star safe harbor, is it not? No. Under the circumstances, you follow from the well star. The duty again is to protect the insured. We would, under those circumstances, uh, be leaving are insured, exposed to potential other claims, uh, that were being assigned and had actually been assigned in the case. But you also knew. But you also knew that she was a state employee. You also knew that there were no liens pending at the time, and the person you had hired, Mr Allred suggested to you that there would likely be no liens, and he recommended against the language in the letter. Why doesn't all of that create an issue of fact for the jury under Wellstar? Let me respond first. As far as Mr Allred is concerned, he actually was not involved in the language and the drafting of the letter, first of all. But as far as the question your honor is raised relative to the question of fact in this case and ensure it are part of the acclaim. It is required to address lanes and in Wellstar decision that cited to a particular decision from Texas in which McDonald is the decision that was referenced, and that is 2011 Texas 2011. And in that case, we have the precise facts that we're confronting in this case, which the Georgia Court of Appeals cited to unanimously and recognize the dynamic that would be created by not addressing liens. Um, to follow your question regarding the Wellstar. So for those reasons, it was impossible to do anything. And I would once again go back to the question relative to the timing and everything. Mrs Kemper made her demand, and that was received, and she demanded it be paid within a certain period of time. Those monies were paid. But before responding to that, uh, equity statewide used due diligence to check the lanes. But it would be impossible, impossible to predict that there were not be leads filed in the middle under Georgia's lean statutes. The, um, insured. There's no requirement. Absolute requirement that insured received notice of the lane or the carrier, such as equity. In this case, the person with the most knowledge about this is Mrs Kemper. In fact, given the how long was how long was Mrs Kemper required to keep these funds in an escrow account? According to your letter under those circumstances, if there were no pending leads at that time, she demanded. You said any and all leans pending. What did that mean? We wouldn't know until because we don't have the ability to know what pens, and that's the reason it is incumbent on a claimant to address this issue. Um, because they have the best knowledge. Mrs Kemper had was the person who was required under Georgia lean statute. Uh, why didn't you tell her? Why didn't you tell her that she had to create an escrow account? Um, until she cashed the check? Because if there were no leans filed up to that point, there wouldn't be any liability or concern for anybody. You gave her an open ended demand to create an escrow account and put this in there. And then when he was deposed, Mr Chop said that demand referred to hypothetical leans never filed, perfected or contemplated. How is that come within the well star safe harbor? Because it is incumbent upon the insured to give assurances that there are no leads. And in this case, her command do not contact us. Prevented equity statewide from inquiring about those things. I'm granting you all of that. I'm I'm a for purposes of my question. But then you've asked her to create an escrow account and put the check into it. And Mr Chop, who wrote the demand letter, says that the escrow demand referred to hypothetical hypothetical leans never filed, perfected or even contemplated. If that's his understanding as the drafter, what sort of an understanding is Miss Kemper going to have about the escrow demand? First of all, she never communicated with us to know what was out there. So she prevented there from ever being a dialogue regarding the lanes. I'm accepting all of that. I understand that. But what I'm saying to you, Your Honor, is that we go back to the core here, and that is, first of all, by not addressing the leans, there was no agreement. And not only that, the second argument that I was making was that equity's response was reasonable given the totality of the circumstances in her refusal to or silence relative to addressing it. Well, you argued in the first in the first set of cases where you lost the took the check and received it, that there was a settlement reached, right? Even though there was no creation of an escrow account. Now, I could think different. No, I don't think so. I mean, obviously, we've got the mirror image rule as far as that underlying case. However, the reality of it is Mrs. Kemper had the ability to do whatever she wanted to do if there were no lanes. There was no requirement. We did not say you must forever and ad infinitum have these funds in an escrow account, and we cited to the decision of Holt, which provided precisely these facts and circumstances. So in that context of citing to the whole decision, we expressly were making the point that if there were no lanes, and that's the reality of the fact, Your Honor, is that there were no lanes. And so this is one of those situations where she could have done what she please with those moneys. Why didn't you just tell her that if there are no lanes, you can cash the check and there's no need for an escrow account? Because we don't know if there are lanes or not. No, no, but you put the onus on her. You tell her, if there are no lanes, you can cash the check. Why didn't you? Because under the Georgia lien statute, she would be required to sign a release of any liens, and we didn't know what there was or not under those circumstances to insulate. So you're saying, on the one hand, you're saying she's free to cash it. And then on the other hand, you're suggesting she's not if there are potential liens out there. No, it's not a matter of potential liens. We do not know. When we sent that check, we knew that there was at least a couple of day of gap as far as the registration of liens online. And then we didn't know when she would actually sign that release. So the reality of it, and this is the reason this circumstance follows in the Krebs case and the McDonald case, as well as the Wellstar case, is that you go to the illogical conclusion that an insured could, or pardon me, a claimant could wait for some time period and a lien is filed, and then that creates a situation where there is then double indemnity under those circumstances. And that's not what the law is. Here, and I'll go back unless your honor has further questions regarding it, but, you know, the reality of the situation, we've taken the position that there was not even a whole demand in light of the law under the Wellstar decision, as well as the Krebs case, as well as the reference in the Wellstar case to the McDonald case in Texas, which again, were precisely under the facts that we confront here, and that the demand in McDonald was absolutely silent as far as liens. And they said in that decision, that absent addressing liens, that was what they call it in Texas. And that given that dynamic, it couldn't even be a potential hope demand, where it would bring in the potential of excess liability. So it's our contention that everything flows from that. You know, furthermore, as far as the demand itself, you know, it is ambiguous as written, given that there were certain things that she did not respond to, including the fact of the limited liability release, she left it open to what that content of that limited liability release would be, and then uses this vague phrase of incurred costs. So with all that taken into account, there certainly could not be a meeting of the minds. And then there's also the issue in this case of the cited in or discussed in our brief, the MFSEA, and the federal law that requires someone to represent that there's no Medicare or Medicaid rights that are out there. In this case, equity went to the point of actually sending two different types of MFSEA statements before, along with the check and had, I would not have been complying with the law, because they wouldn't even be required to issue payment in until the MFSEA was signed in return, but they did it in a dual way. So that was their attempt to do everything in their power to do this. Mr. Dolder also made the raised the question that we were matters along those lines. The reality is we didn't know again what she was going to do. We left blanks in there, and we invited her to call us. She did not demand what was in the release other than saying this vague language of incurred costs. My time has expired, Your Honor, so I will conclude. Thank you very much, Mr Schmidt. Mr Dolder, you've got your rebuttal time. Thank you, Your Honor. There were several references to the Texas case of McDonald v. Home State. Um, I hope the court reads it. I have it here. It's a 2011 Westlaw 1103116 and equity has and we just heard it stands for the re for the proposition that claimants in Miss Kemper's situation have the affirmative duty to raise the issue of liens in all cases. And and that and I heard this that McDonald precise facts as in this case. Here are the facts in McDonald. The accident was on August 4 2001 Memorial Hospital filed a notice of hospital lean on August 5 2001. The settlement demand was dated June 5 2000 and two. That case is not on all fours with this because there a lien was filed and perfected in the public record. That's also like Wellstar Wellstar v Southern General. There were liens filed in the in the public record, and everyone had notice of him. But the claimant refused to do anything about him. That's not this case. As equity just said its own counsel, there were no liens. Judge Legault, I want to go back to one one of your first questions to me. Why Wellstar v Southern General, the safe Harvard doesn't apply. And we talked about one of its elements, which is no outstanding hospital lanes. But there's another element that needs to be addressed, and that is Judge Dillard in crafting the safe harbor specifically wrote that the lien issue has to be the sole reason there was no settlement. And he the judge put the word soul in italics to emphasize it. In this case, the whole lien issue is not the sole reason that the claim did not settle. Other reasons the claim did not settle include statewide trying to sneak in the property damage release, um, into the release as Mr Dole. Let me interrupt you for a second. I didn't see that argument anywhere in your brief about the property damage. Can you tell me where you make that argument? I couldn't cite to you the page number right now, Your Honor. But I have a lot of confidence that we did. Um, and I'm sorry. I just going back to that the letter where they returned the check that was signed by Mr Warner, which was, um, uh, counsel for Miss Kempner at the time. Um, the sole reason for rejecting the letter or the full amount was based on the quote unquote demand that she placed her money in an escrow account. That was the only reason given. Uh, there was no other reason for rejecting the offer. So I'm confused. Is there another letter? No, Your Honor. There's, uh, Mr Warner's testimony and Miss Kempner's list. All of the reasons that the counter offer was unacceptable. I don't I do not have his letter in front of me, but I don't think it purported to say this is the exclusive list. So construing the testimony that we have in favor of the non moving, there were other reasons. And, uh, Mr Mr Warner and Miss Kemper both testified that there were other reasons and, uh, broad indemnity and which was not limited 25,000. Her indemnity obligation to equity and statewide could have easily surpassed the policy limits. And I did want to address one thing about Mr Warner. Um, and I would encourage the court to, um, check the affidavit of expert Peter Law. That's docket number 249 hyphen five. And and it shows that what Mr Warner did in this case, you know, he saw a person in a horrible situation, tried to help her out pro bono, and that this is a common, uh, and responsible practice for, uh, you know, lawyers of his stature in the plaintiff's community. And, uh, and and also with regard to Mr Warner, I would prefer the court to the case of more of the Geico. There's two of them actually by that name. But the one at 633 Fed app 9 to 4 is important with regard to Mr Warner. My time is up. Thank you very much. All right. Thank you both very much. We are in recess until tomorrow morning, then. Thank you.